UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CR-22-16-G |
| ) | |
| ZQUAREUS TROYEZ IMMANUEL ) | |
| THOMAS, ) | |
| ) | |
| Defendant. ) | |

### ORDER

Now before the Court is a Motion to Suppress (Doc. No. 25), filed through counsel by Defendant Zquareus Troyez Immanuel Thomas. The Government responded in opposition (Doc. No. 28) and Defendant replied (Doc. No. 35). On April 15, 2022, the Court conducted an evidentiary hearing on the Motion. Defendant appeared personally and through counsel, Taylor McLawhorn and Laura Deskin. The Government appeared through Assistant U.S. Attorney David Nichols. Upon consideration of the evidence and the parties' arguments, the Motion is GRANTED.

Defendant has been charged in a one-count indictment with possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment (Doc. No. 1). Defendant has moved to suppress evidence obtained when he was detained and searched, namely evidence that there was a gun tucked into Defendant's waistband. *See* Def.'s Mot. at 7. The Government responds that Oklahoma City Police Department ("OCPD") Officer Troy Nitzky conducted a lawful investigatory detention and

pat-down search of Defendant under *Terry v. Ohio*, 392 U.S. 1 (1968).  *See* Gov't's Resp. at 3.

I.   The Fourth Amendment and the <u>Terry</u> Exception for Investigatory Detention

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "A search typically requires a warrant based on probable cause.  Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment—subject only to a few 'specifically established and well-delineated exceptions.'"  *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020) (citation and internal quotation marks omitted) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

In *Terry*, the Supreme Court recognized an exception to the Fourth Amendment when a law enforcement officer briefly detains a person for questioning and conducts a limited search of the person to assure the officer's safety during questioning.  Under *Terry*, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30).  This is an objective inquiry: an investigative detention "is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime."  *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) (internal quotation marks omitted).  "In determining whether reasonable suspicion justifies an investigative

detention, we examine the totality of the circumstances, asking 'whether the detaining officer has a particularized and objective basis for suspecting wrongdoing.'" *United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

II.     Background

On April 15, 2022, the Court heard evidence and argument from the parties relevant to Defendant's Motion to Suppress. Based on the exhibits and testimony submitted by the parties, the Court makes the following findings of fact.

On December 14, 2021, Tommy Ingram called 911 and reported that there was a group of about ten men—described as "bloods," i.e., gang members—in and around a Denny's restaurant in Oklahoma City and that these men had "guns on them." *See* Doc. No. 25-1 (audio recording). Mr. Ingram stated that he was inside the Denny's and, at various points in the 911 call, stated that the men were inside the Denny's, outside the Denny's, or both. *Id*. Mr. Ingram stated that "one of them got a red hat, black jacket, the other one got on all gray." *Id*.

The operator asked Mr. Ingram if the men were threatening anyone with the guns, and Mr. Ingram stated "yeah well it's me they, Tommy Ingram, they after me. They after, no [unintelligible] they just got them on them. I know we got, they got them on them, because everyone do at the motel. [unintelligible] that they, uh, out to get me." *Id.* The operator apparently interpreted this statement to mean that the men were not threatening Mr. Ingram or anyone else at the Denny's: the Computer-Aided Dispatch ("CAD") Report contains a message sent to OCPD officers that the calling party "says that [the men] are

3

not threatening anyone they just have guns on them." *See* CAD Report (Doc. No. 35-1) at 4.  Later in the call, the operator asked Mr. Ingram for an update as to where the men with the guns were, and Mr. Ingram stated that "they ran back in the motel across the street and then the one in the white Charger is out there now."  Doc. No. 25-1.

OCPD Officer Troy Nitzky, along with approximately four other OCPD officers, responded to a dispatcher's notice of a "disturbance of multiple males with guns" at the Denny's.  *See* Incident Report (Doc. No. 25-2) at 8; testimony of Officer Nitzky at Apr. 15, 2022 hearing.  The dispatcher stated that the reporting party, Mr. Ingram, "saw a gun on subjects and he believed they were after him."  *Id.*  Officer Nitzky testified that he did not recall seeing a description of the males prior to entering the Denny's and did not access call data while inside the Denny's.

As Officer Nitzky approached the Denny's, he did not observe a disturbance or a group of people lingering outside the restaurant.  Once inside, Officer Nitzky found the customers and employees to appear to be calm and unconcerned.  Officer Nitzky spoke briefly with Defendant, who was standing in the central area where customers wait to be seated.  Defendant told Officer Nitzky that a man had been walking around outside and then the man left.[1]  A Denny's employee then approached Officer Nitzky in the waiting

---

[1] Unless otherwise indicated, quotations of statements made by or to the OCPD officers at the Denny's are based on the Court's review of the video recorded by Officer Nitzky's body-worn camera, filed conventionally with the Government's Response, and admitted into evidence at the evidentiary hearing.  *See* Doc. No. 28-1.  Defendant's initial statements to Officer Nitzky are difficult to discern from this footage.  According to the Government's characterization, "Officer Nitzky talked to Mr. Thomas, who told him the suspect had already left."  Gov't's Resp. (Doc. No. 28) at 2.

4

area and stated, while Defendant was standing nearby, that "I think that [Mr. Ingram's] scared of the guy, that's why he call you," and that "the guy" had already left.

Officer Nitzky next spoke to Mr. Ingram, who was standing near the waiting area and talking to the 911 operator. After having Mr. Ingram hang up the phone, Officer Nitzky restrained Mr. Ingram's hands and patted him down. Officer Nitzky instructed Mr. Ingram to sit on a bench in the waiting area, which he did. Officer Nitzky stated, "There wasn't anybody in here man. I was sitting out here when you were on the phone." Mr. Ingram explained that he told the 911 operator "that they were outside." Another officer asked Mr. Ingram, "So you saw someone outside, and you thought they had a firearm?" Mr. Ingram responded, "I know they had a firearm." A third officer asked Mr. Ingram, "Did you see it?" Mr. Ingram did not respond. In response to another question about the 911 call, Mr. Ingram stated, "I said there were five guys, she [i.e., the 911 operator] said where they at." Officer Nitzky then stated, "And you said inside the restaurant." Mr. Ingram responded, "No sir, I said out there in the car and [unintelligible]." Mr. Ingram then said, "That's one of them right there" and nodded in the direction of Defendant, who had been standing behind the officers in the waiting area during the questioning of Mr. Ingram.

Officer Nitzky turned to Defendant and asked him if he knew Mr. Ingram. Defendant stated that he did not. Officer Nitzky then asked Defendant if he could pat him down. Defendant refused, stating, "I don't really want to be touched." Officer Nitzky then placed Defendant in handcuffs and performed a pat-down search of him. During the search, Officer Nitzky found a handgun under Defendant's clothing in his waistband. The officers

determined after this investigatory stop that Defendant had previously been convicted of a felony.

### III. Discussion

"The purpose of a suppression hearing is 'to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments.'" *United States v. Maurek*, 131 F. Supp. 3d 1258, 1261-62 (W.D. Okla. 2015) (quoting *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982)). In seeking to suppress evidence as violative of the Fourth Amendment, the defendant "bears the burden of proving whether and when the Fourth Amendment was implicated." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994). "The government then bears the burden of proving that its warrantless actions were justified (*i.e.*, as a lawful investigatory stop, or under some other exception to the warrant requirement)." *Id.*; *accord United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021) ("[I]f the police acted without a warrant the burden of proof is on the prosecution." (internal quotation marks omitted)).

The parties do not dispute that the warrantless detention and search of Defendant implicated his Fourth Amendment rights. In its briefing and at the suppression hearing, the Government has asserted that the investigatory detention and limited search of Defendant were justified under *Terry*.² After considering all the information presented,

---

² The Government does not contend that the detention and search of Defendant were justified as an investigation of criminal activity by someone *other* than Defendant such as might implicate the exigent circumstances exception to the warrant requirement, or a

6

and applying the standards set forth above, the Court concludes that under the totality of the circumstances the detaining officer here did not have a particularized and objective basis for suspecting that Defendant had or was about to commit a crime, such as would permit the investigatory detention of Defendant.[3]

Officer Nitzky testified that at the point he initiated the investigatory detention of Defendant, he was acting on his suspicion that Defendant was one of a group of men who had threatened to harm Mr. Ingram. As an initial matter, while the Government suggests that Officer Nitzky could have reasonably suspected Defendant of crimes other than threatening Mr. Ingram, the Court finds that suggestion to be unsupported. First, the

---

purpose other than particularized crime detection such as might implicate the special needs exception.

[3] Defendant additionally suggests that the pat-down search was unreasonable. That assertion is easily resolved, however. There is no dispute that Defendant was identified as one of a group of men who were carrying guns. While gun possession alone is not a crime in Oklahoma, and thus suspicion of gun possession is not by itself a sufficient ground for an investigatory detention, a law enforcement officer's reasonable belief that a person who has been stopped might be in possession of a gun is a sufficient ground to conclude that the detainee "posed a serious and present danger to the safety of the officer," allowing a limited search of the detainee for any such gun. *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (distinguishing question of propriety of stop from question of propriety of frisk); *see Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009) ("[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous."); *United States v. Rodriguez*, 739 F.3d 481, 491 (10th Cir. 2013) (finding pat-down search proper where officer observed defendant to be in possession of gun, even if officer otherwise "had no reason to believe [defendant] was dangerous"); *see also United States v. Robinson*, 846 F.3d 694, 701 (4th Cir. 2017) ("The presumptive lawfulness of an individual's gun possession in a particular State does next to nothing to negate the reasonable concern an officer has for his own safety when forcing an encounter with an individual who is armed with a gun and whose propensities are unknown."). Further, the Court finds that the invasiveness of the pat-down search of Defendant did not exceed what was appropriate under the circumstances to locate the suspected gun.

7

investigatory detention could not, without more, properly be based on a suspicion that Defendant was in possession of a gun.  While Officer Nitzky certainly had reason to believe that some or all of the group of men described by Mr. Ingram were in possession of handguns, Oklahoma law allows the carrying of handguns by many people in many places. *See, e.g.*, Oklahoma Self-Defense Act, Okla. Stat. tit. 21, §§ 1290.1-1290.27.  The Government did not argue or present evidence that Officer Nitzky was aware of facts supporting a reasonable suspicion that Defendant, or any of the group of men, was prohibited by the State of Oklahoma from carrying handguns inside or outside the Denny's.

Second, the investigatory detention could not be based, under the facts, on a suspicion that Defendant or any of the group of men described by Mr. Ingram had pointed or brandished, or even displayed, a gun.  At the hearing, Officer Nitzky—after having testified that he initiated the investigatory detention on the basis that Defendant had been identified as one of a group of men who were reportedly threatening Mr. Ingram—stated that he agreed with counsel for the Government that "the act of either brandishing or pointing a firearm at someone could make out any number of state felony charges" and that this was the type of criminal offense he was considering at the inception of the detention.  There is nothing in the record, however, indicating that Officer Nitzky had an objective basis to suspect that one or more of the men had brandished or pointed a firearm at Mr. Ingram.  To the contrary, the customers and employees inside the Denny's appeared calm and unconcerned when the officers arrived, and neither they nor Mr. Ingram stated that anyone, including Defendant, had brandished a firearm or otherwise displayed a firearm in a threatening manner.  When questioned directly by the officers, Mr. Ingram stated that he

"kn[e]w they had a firearm" but pointedly said nothing when asked if he had actually seen a firearm.[4]

The Court turns then to the primary question of whether, at the time the investigatory detention of Defendant was initiated, there was a particularized and objective basis for suspecting that a group of men, including Defendant, had threatened or were intending to do harm to Mr. Ingram. The primary facts adduced by the Government as supporting such a suspicion are that: (1) Mr. Ingram had called 911 to report a fear of being harmed by a group of men at the Denny's where Mr. Ingram was eating, (2) Mr. Ingram had reported that the men in the group "were after him," (3) the Denny's was in a high-crime area, (4) Mr. Ingram had stated that the men in the group were gang members,[5] (5) Mr. Ingram had stated that the men in the group were in possession of guns, and (6) Mr. Ingram identified Defendant as one of the group. The record is not clear as to whether Officer Nitzky was aware of the statement by the dispatcher in the CAD Report that Mr. Ingram had said the men in the group were not threatening anyone.

---

[4] Because neither the CAD Report nor the 911 Call contains statements referring to the pointing or brandishing of a firearm, imputation of knowledge of their contents to Officer Nitzky would not change the analysis. In the 911 Call, Mr. Ingram mentions that one of the group of men was "sittin' there toyin' with the gun in his pocket" prior to entering the Denny's. The CAD Report also contains a statement by the dispatcher that the caller (Mr. Ingram) had stated he was "talking to [suspect] with gun in his pocket." CAD Report at 3. While it is possible to point or brandish a handgun without removing it from a pocket, there is no statement indicating that is what happened here. Rather, the dispatcher states shortly after referencing the pocket incident that Mr. Ingram is "rambling" and that he said the men "are not threatening anyone they just have guns on them." *Id*. at 4.

[5] For the purpose of deciding the Motion to Suppress, the Court assumes that Officer Nitzky was aware that Mr. Ingram had described the men as gang members.

9

The Court agrees with Defendant that the inconsistencies in Mr. Ingram's complaints to law enforcement raise issues as to the credibility of the information that was being provided. When an officer's decision to make an investigatory detention is based on information provided by a third party, rather than the officer's own observations, a reviewing court must assess "whether that information . . . possessed sufficient indicia of reliability." *McHugh*, 639 F.3d at 1257-58 (internal quotation marks omitted). Factors to consider in assessing the reliability of such a report include:

> (1) whether the informant lacked 'true anonymity' (i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.

*United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011). The Tenth Circuit has indicated that if the informant is an "identifiable individual" (as opposed to an anonymous source) who is reporting "firsthand, detailed information about the alleged incident," the officer may accept the information as credible without exhaustive corroboration. *See United States v. Romero*, 839 F. App'x 226, 229 (10th Cir. 2020).

Applying these standards, and giving deference to all inferences Officer Nitzky could reasonably have drawn in favor of the credibility of Mr. Ingram's complaint, the Court concludes that the detention and search of Defendant at the Denny's on December 14, 2021, was an unjustified violation of Defendant's Fourth Amendment rights. The vague statement by Mr. Ingram that he believed a group of men "were after him" is not enough, by itself, to provide a particularized and objective basis for suspecting that

Defendant had committed or was about to commit a crime. While this was a firsthand report by an identifiable informant, it lacks even the minimal level of detail needed to make reliance on the report reasonable. Mr. Ingram did not describe a statement, gesture, or expression by any of the group of men that could have been reasonably viewed as an expression of an intent by Defendant to harm Mr. Ingram. Nor did any other person. Mr. Ingram did not describe a state of affairs that could have been reasonably viewed as indicative of an intent by Defendant to harm Mr. Ingram. Nor did any other person. Thus, even if the Court were to assume that Officer Nitzky was not aware that Mr. Ingram had apparently stated that the men in the group "[we]re not threatening anyone" at the Denny's, the totality of the circumstances set forth above does not allow a reasonable suspicion that a group of men, including Defendant, had threatened or were intending to do harm to Mr. Ingram on December 14, 2021, such as would justify the investigatory detention of Defendant on that date.

## CONCLUSION

Accordingly, Defendant's Motion to Suppress (Doc. No. 25) is GRANTED.

IT IS SO ORDERED this 7th day of June, 2022.

_____
CHARLES B. GOODWIN
United States District Judge